**WARNER BROS. INC., a corporation and Hoya Productions, Inc., a corporation, Plaintiffs,**

**v.**

**FILM VENTURES INTERNATIONAL, a corporation, et al., Defendants.**

**No. CV 75–2774–DWW.**

United States District Court, C. D. California.

Oct. 10, 1975.

Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Michael Bergman, Beverly Hills, Cal., for plaintiffs.

Rosenfeld, Meyer & Susman, Robert M. Dudnik, Beverly Hills, Cal., for defendants.

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DAVID W. WILLIAMS, District Judge.

Plaintiffs have produced a film "The Exorcist" which has met with great public acclaim and has been said to be the most terrifying motion picture ever made. The producers contend that the film was produced at a cost of over $10 million and has grossed over $100 million by exhibiting it to more than 100 million viewers world-wide. In this action, plaintiffs sue the distributors and exhibitors of another film entitled "Beyond The Door" (hereinafter "Beyond") claiming that it infringes copyrightable subject matter contained in "The Exorcist."

William Peter Blatty wrote the novel "The Exorcist" and then assigned the film rights to plaintiffs and assisted in producing the photoplay based upon the book. It concerns the demonic possession of the character Regan, a 12-year old girl, and the performance of the religious ritual of exorcism to rid her of the spell when medical science fails to do so. The underlying theme includes the battle between good and evil and how faith can overcome the possession and bring about triumph over the devil. In developing this, there was considerable use of symbolism.

The motion picture shows the progression of physical and emotional infirmities which slowly overcome Regan until she is eventually transformed into a horrid, foul-mouthed, vomiting monster with super-human strength.

The theme of "The Exorcist" deals with the classic battle of good versus evil. Regan's mother, having sought the aid of medical science to no avail, turns to the Catholic Church, and two Jesuit priests are designated to conduct an exorcism. After a long ordeal and at the cost of their own lives, the priests succeed in casting the demon from the girl who then returns to her childlike composure.

"Beyond" also portrays demonic possession, but of a mature pregnant woman, Jessica, and to a lesser extent to one of her children. While a religious theme and the element of faith dominate plaintiffs'. film, it has no part in the development of "Beyond", a film centered upon the use of the supernatural or occult powers to rid the possessed person of the forces of evil.

Before the Court is plaintiffs' motion for a preliminary injunction to enjoin the alleged infringement of "The Exorcist"; to prevent future exhibition of "Beyond"; to prevent the use by defendants of advertising material which plaintiffs contend infringes a press book it prepared to exploit "The Exorcist", and to compel defendants to deliver up its allegedly infringing material.

At the outset it is important to note that Warner Bros. does not claim that there is any similarity of story or plot in the two films, for indeed there is not.[1] Rather, plaintiffs claim that the infringement is of the character of Regan and of the cinematic effects used in "The Exorcist" as a means of story expression. These effects include distinctive sounds, special lighting effects, levitation of

---

1. At the request of counsel for both sides the Court viewed a screening of "The Exorcist" on October 3, 1975 and of "Beyond The Door" on October 4, 1975–both at public theaters.

Regan's body and the bed she is confined to, the spinning of the girl's head 360° and the rolling back of her eyes with pupils covered.

Both films depict objects such as chairs and tables flying through the air and show dresser drawers opening and shutting as a result of some unseen force. Both also show human bodies being propelled with great force across a room. Both possessed persons undergo voice changes which you are to believe is the devil speaking from within, and both persons spew vomit at those attempting to perform the ritual. In "Beyond", the character Jessica reacts to the spell by experiencing an abbreviated pregnancy and at one point one of her eyes moves back and forth while the other stares straight ahead. In another scene her head turns approximately 180°, or half the spin effected by Regan. In "The Exorcist" religious techniques based upon faith are used to drive the devil from the possessed girl but no similar religious theme finds its way into "Beyond."

Blatty first learned of the phenomenon of exorcism when an actual happening of a possession was described to him by a Jesuit priest in college.[2] Neither Blatty nor plaintiffs have the right to claim a monopoly in giving expression to this phenomenon. When one thinks of a possessed person he thinks of a person full of inner turmoil and in a long struggle with an evil spirit. The idea seems to be one of the inner person fighting the devil possessing him. One means of giving expression to this characterization is to show the possessed person writhing, vomiting and contorting in a frenzied manner and undergoing rapid physical transformation. The producers of both "The Exorcist" and "Beyond" have used the commonly accepted physical ways of depicting the struggle of the possessed one, and some of the means used are common to each depiction, but neither means is original or subject to copyright. While "The Exorcist" was expensively produced with the aid of costly special effects and makeup technicians and "Beyond" is an inferior

---

2. William Peter Blatty, in an affidavit produced by defendant, tells of the origin of his idea to write the book "The Exorcist." He states that while a student, at Georgetown University he attended a class dealing with problems of religious faith and that a Jesuit priest told of a case of possession and subsequent exorcism which had actually taken place in Washington, D.C. in 1947, and that had received local newspaper coverage. Blatty's subsequent research convinced him that an actual case of possession had indeed occurred involving a boy, the son of a prominent Washington, D.C. family, and he considered writing a book that would relate the incidents of the occurrence in a fictional setting. His research taught him that the boy in the real occurrence had a superficial interest in the occult and embarrassed his mother's guests by revealing humiliating knowledge about them which he could not have learned through any normal means. The boy then began to cry aloud at night, complained that his bed was shaking and moving across the room. The boy then became "a little demon in language and behavior, addressing his mother and others in terms that would make a sea captain blanch." (Aff. p. 6).

The mother sought in vain to get medical help for her son and finally consulted her minister who advised her that a Catholic priest claimed to be able to handle phenomena such as this through exorcism. Eventually an exorcist was summoned and the ritual was commenced and lasted for many weeks.

Blatty's affidavit goes on to say that because of the strength of the boy and his violent disposition, he had to be strapped into his bed; he urinated endlessly and accurately and over great distances, with the exorcist as his target; he vomited a green substance sufficient in volume to fill the entire room. The boy's voice altered to that of a deep and husky tone and his face became the face of someone else. He began speaking in three languages, allegedly unknown to him previously, and he was violent and abusive to the priests who were conducting the exorcism.

In writing his book, Blatty changed the possessed person from a boy to a girl and changed the location from Washington, D.C. in order to protect the persons actually involved in the occurrence.

This affidavit was filed by Blatty in another lawsuit filed in this district, (*Russel v. Blatty*, No. 71-184-IH) in which the plaintiff, author of a novel entitled *The Case Against Satan*, contended that the novel *The Exorcist* infringed his book. In the role of a defendant, Blatty made many statements in his affidavit that come to the support of the position of defendant Film Ventures in the instant lawsuit.

picture with a low production budget, the latter cannot be said to have trampled upon cinematic techniques which were the exclusive property of plaintiffs.

> "one work does not violate the copyright in another simply because there is a similarity between the two, if the similarity results from the fact that both works deal with the same subject, or have made use of common sources." *Harold Lloyd Corp. v. Witwer*, 65 F.2d 1 (9th Cir. 1933) citing 13 C.J. § 278 p. 1114.

### CHARACTER PROTECTIBILITY

■ Plaintiffs urge that in the character Regan they have a property that is protectible under the copyright laws and which defendant has copied with its character Jessica. Ordinarily, characters in a play are not protectible. *Columbia Pictures Corp. v. National Broadcasting Co.*, 134 F.Supp. 348, 353 (S.D. Cal.1955). Cases that uphold copyright protection of a character are those where the character was distinctively delineated by the author and such delineation was copied. *Nimmer on Copyrights*, § 30. Judge Learned Hand has written that "It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2nd Cir., 1930).

■ In *Warner Brothers Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945 (9th Cir., 1954) the Court held that the Sam Spade character was not protectible and found that no character is protectible under copyright law unless "the character really constitutes the story being told" and is not merely a "chessman in the game of telling the story." [3]

The Walt Disney Mickey Mouse cartoon character was held protectible under this test in *Walt Disney Productions v. Air Pirates*, 345 F.Supp. 108 (N.D.Cal. 1972) because the "plot of the piece not only centers around the character but is quite subordinated to the character's role (and) . . . the principal appeal of each of the plaintiff's work to the primary audience of children for which they were intended lies with the character and nothing else." P. 113. That Court found that the cartoon character(s) as developed by Disney had achieved a high degree of recognition and identification that was protectible.

I cannot conclude that the story "The Exorcist" was subordinated to the character Regan. Even, arguendo, if this were held to be true, there is substantial difference between the character of Regan, a demure child who turns into a profane monster and whose possession is driven from her by religious means, and Jessica, a mature woman in the early stages of pregnancy whose possession exemplifies itself by a more rapid than normal development of her fetus, and whose possession is not expelled by religious faith.

■ The issuance of a preliminary injunction in an infringement action is within the sound discretion of the Court. *Dymo Industries v. Marcus Bros. Textile Corp.*, 326 F.2d 141 (9th Cir., 1964). Such harsh action should not be undertaken unless plaintiffs have convinced the Court by its evidence that there is a great likelihood of infringement by defendant and there is reasonable certainty that plaintiffs will prevail at a trial on the merits. *Nimmer* § 157.1; *American Visual Corp., v. Holland*, 261 F.2d 652 (2nd Cir., 1958).

Since plaintiffs do not contend that "Beyond" copies the plot of "The Exorcist" it contends it is damaged because defendant's picture has appropriated the manifestations, visual and aural presentation and special effects which, acting together, blend to create the essence of the motion picture "The Exorcist." Plaintiffs assert that it is the cinematic elements such as sound effects, lighting, levitation and makeup design by which

---

3. This holding is criticized by Professor Nimmer in his work on Copyright, § 30 pp. 134.2–134.3.

the Blatty novel was given expression into another art form by the film maker and that this was copied by defendant's film.

Defendants contend that the use of flickering lights, raucous "haunted-house type" noises, flying bodies and objects about a room, levitation and the changing of human features from placid to gruesome are theatrical tricks which have for many years been used in other films and stage plays. They deny that "Beyond" has attempted to group the use of its special effects in a manner that shows substantial similarity to the grouping used in "The Exorcist." To view the two pictures is to find substantial merit to this argument. It is also evident that "Beyond" does not make a blatant effort to use a character similar to that used in the Exorcist or to duplicate the phenomenon contrived to rid the character of the evil spirit. In "The Exorcist" religious techniques based upon faith are used to drive the devil from the possessed girl; no similar religious theme finds its way into the "Beyond" story.

### PRESS BOOK INFRINGEMENT

Plaintiffs claim violation of its copyrights in certain advertisements used in promotion of "The Exorcist." One advertisement (Plaintiffs' exhibit C) shows a door partially opened with light coming through into a dark room. Defendant's advertisement (Plaintiffs' exbit E) shows substantially the same door with the same effect of light entering a darkened room. The only difference between the two advertisements is the addition of the possessed woman's face in the defendant's advertisement and the different titles. Otherwise the scenes are identical and obviously infringe plaintiffs' rights if this advertisement was properly copyrighted.

■ Defendant claims that since the advertisement was first published on February 15, 1974 in the Los Angeles Times without a valid copyright mark, defendant's use of the door cannot be said to infringe. Plaintiffs admit that no copyright mark appeared on the February 15th advertisement but that a valid copyright for the Warner Bros. press book containing this advertisement was obtained on February 17th, 1974 They further assert that the copyright which the Los Angeles Times has over all of its material protects plaintiffs' advertisement. I agree with this contention and grant an injunction against further use by defendant of the door advertisement. *Nimmer,* § 24.41 at p. 109; 17 U.S.C. § 3.

■ Plaintiffs bring one further complaint which has merit. Defendants, in advertising the picture "Beyond" use a letter "T" in the second word of the title which is intentionally designed to resemble a crucifix. "The Exorcist" has a basic religious theme where through faith the evil spirit is driven from Regan by priests. A crucifix is used as a part of the ritual. In an earlier scene, Regan, crazed by the possession, abuses herself sexually with a crucifix. Thus a crucifix is given great importance by the producers of plaintiffs' film in the depiction of the girl's agony and in the performance of the religious rite. The theatre public is aware of this. It is therefore a practice of unfair competition on the part of the exhibitors of "Beyond" a picture having no religious theme and which at no time portrays a crucifix, to prominently (or at all) display a crucifix in its advertising of the picture. There is thus created a suggestion that "Beyond" is a sequel to "The Exorcist" and possibly that it was produced by the same craftsmen who skillfully produced "The Exorcist", and that it might be a film of the superior quality of "The Exorcist", which it is not. The defendants are directed to forthwith withdraw the use in any way or manner the advertisement or any other display of the name "Beyond The Door" using a cross or crucifix or any elongated form of the letter "T" as contained in the advertisement now in use and of the open door advertisement.

Such discontinuance of the use of these or any similarly deceptive ads shall remain in full force and effect until the further order of this Court.

The petition to enjoin the continued exhibition of "Beyond" is denied but defendants are enjoined from the continued use of the advertisements mentioned hereinbefore.