855 F.2d 1446
 1988 Copr.L.Dec. P 26,319, 8 U.S.P.Q.2d 1231
 Ernest OLSON, Plaintiff-Appellant,
v.
NATIONAL BROADCASTING COMPANY, INC., Defendant-Appellee,
and
Karen Hendel; Stephen Cannell; MCA, Inc. & MCA Television,
Ltd., Defendants.
Ernest OLSON, Plaintiff-Appellee,
v.
NATIONAL BROADCASTING COMPANY, INC., Defendant,
and
Stephen Cannell, MCA, Inc., and MCA Television, Ltd.,
Defendants-Appellants.
Ernest OLSON, Plaintiff-Appellant,
v.
NATIONAL BROADCASTING COMPANY, INC., Defendant,
and
Joseph Cannell, dba Stephen J. Cannell Productions, MCA,
Inc., and MCA Television, Ltd., Defendants-Appellees.
 Nos. 86-6325, 87-5606 and 87-5664.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 2, 1988.
Decided Sept. 1, 1988.
 
 Russell H. Beatie, Jr., Law Offices of Russell H. Beatie, Jr., New York City, for plaintiff/appellant/appellee.
 Ronald S. Rosen, Silverberg, Rosen, Leon & Behr, and Louis P. Petrich, Leopold, Petrich & Smith, Los Angeles, Cal., for defendants/appellees/appellants.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN, CYNTHIA HALL, Circuit Judges, and SCHNACKE,* District Judge.
 GOODWIN, Circuit Judge:
 
 
 1
 Plaintiff Ernest Olson appeals a judgment notwithstanding the verdict granted to National Broadcasting Company (NBC) on his claim that NBC's television series "The A-Team" infringed his copyright.
 
 
 2
 Olson sued NBC, Stephen J. Cannell (individually and dba Stephen J. Cannell Productions), MCA Inc. and MCA Television Ltd.[1] for infringement of his treatment and screenplay for a television series pilot entitled "Cargo." Olson also alleged pendent state-law claims, which were dismissed before trial.
 
 
 3
 The jury found by special verdict that "The A-Team" was substantially similar to the treatment and screenplay for "Cargo" and that the substantial similarity resulted from copying of Olson's works. It found that the Cannell defendants, who wrote and developed "The A-Team," had not copied Olson's works. However, the jury found that NBC had copied "Cargo."
 
 
 4
 NBC moved for j.n.o.v., and, in the alternative, for a new trial. Cannell and the MCA defendants moved for a protective order reversing the jury's finding of substantial similarity, and, in the alternative, for a new trial.
 
 
 5
 The district court granted each of the defendants' motions. In the memorandum decision explaining its judgment, the court found that Olson had failed to prove that the defendants who created the allegedly infringing work had access to his work. It also found that "The A-Team" was not substantially similar to the "Cargo" works under either the extrinsic test or the intrinsic test. Finally, it found that no reasonable person could conclude that NBC copied the general ideas or protectable expression of "Cargo."
 
 
 6
 On appeal, Olson does not attack the jury's finding that the Cannell defendants did not have access to his works. He asks the panel to overturn the district court's grant of j.n.o.v. and to reinstate the jury's findings that NBC had access to his works and that "The A-Team" was substantially similar to "Cargo." He asks that the jury's finding of substantial similarity be made binding upon the Cannell defendants.
 
 
 7
 A district court may grant j.n.o.v. only "if the evidence permits of only one reasonable conclusion as to the verdict." Garter-Bare Co. v. Munsingwear Inc., 723 F.2d 707, 709 (9th Cir.), cert. denied, 469 U.S. 980, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984); see Fed.R.Civ.P. 50(b) (providing that j.n.o.v. is appropriate when a party would have been entitled to a directed verdict under Fed.R.Civ.P. 50(a)). On appeal from j.n.o.v., "we view the evidence in a light most favorable to the party against whom the motion is made." Garter-Bare Co., 723 F.2d at 709.
 
 
 8
 I. Copyright Claim.
 
 
 9
 "[I]n order to establish copyright infringement a plaintiff must prove ownership of the copyright and 'copying' by the defendant." Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1162 (9th Cir.1977). Because the defendants do not dispute Olson's ownership of the copyright, Olson may prevail by demonstrating that the defendants copied his works. Copying is "shown by circumstantial evidence of access to the copyrighted work and substantial similarity between the copyrighted work and defendant's work." Id. Because we affirm the district court's grant of j.n.o.v. on the ground that there existed no substantial similarity between "The A-Team" and "Cargo," we do not reach the question whether the jury properly could have found that NBC had access to Olson's works.
 
 
 10
 The jury found by special verdict that "The A-Team" was substantially similar to Olson's works in both ideas and protectable expression. The district court granted j.n.o.v., finding that there existed no substantial similarity under either the extrinsic or intrinsic test.
 
 
 11
 Krofft sets forth a two-part test for determining whether one work is substantially similar to another. See Krofft, 562 F.2d at 1164; see also Aliotti v. R. Dakin & Co., 831 F.2d 898, 900 (9th Cir.1987). The "extrinsic" test, which is used to determine whether there is a substantial similarity in ideas, "depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." Krofft, 562 F.2d at 1164. The "intrinsic" test, which is used to compare forms of expression, "depend[s] on the response of the ordinary reasonable person." Id. Although analytic dissection and expert testimony are appropriate under the extrinsic test, they are not appropriate under the intrinsic test. See id. To demonstrate substantial similarity, Olson must prove both substantial similarity of general ideas under the extrinsic test and substantial similarity of the protectable expression of those ideas under the intrinsic test. See id.; Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985).
 
 
 12
 "Cargo" features a unit of three Vietnam veterans--Van Druten, Tronski and Brown--who developed a group practice of conducting scams in Vietnam and continue to conduct such scams as civilians. While in Vietnam, they alienated Col. Kilgore and Lt. Brite by humiliating them in order to prevent them from uncovering a scam. Today, Tronski and Brown work together for an air cargo business in Miami. Tronski is romantically involved with Marsha Bainwright, the daughter of the owner of the air freight company.
 
 
 13
 Olson provides three- to four-line descriptions of each of his characters. He compares Van Druten to John Ritter, describing him as an old-money New York intellectual who has studied medicine; he was the group's navigator in Vietnam, and he is reluctant to become involved in the group's scams but agrees to participate. Tronski, who is compared to Nick Nolte, is an impulsive, quick-thinking "good old boy" from the South; he was a pilot in Vietnam and serves as the trio's leader and strategist. Brown, described as a "Rosie Greer [sic ] type," is depicted as a physically large, athletic, sensitive, emotionally deep man from the deep South. Kilgore is a "militaristic, extremist, schizoid" Southerner. Marsha Bainwright, who resembles Kate Jackson, is said to be wealthy and elegant.
 
 
 14
 "Cargo" is set in the present. Kilgore and Brite, who are now corrupt Drug Enforcement agents, threaten Tronski and Brown with unjustified smuggling charges, which are to be dropped if they cooperate in breaking up a large Colombian cocaine smuggling ring. Because Van Druten closely resembles the ringleader's son, the DEA agents force Tronski and Brown to enlist his help. After a series of plot episodes that lead the trio to New York City, Florida, Colombia, and much of the adjacent airspace, the unit escapes in a cargo plane carrying a load of drugs, unaware that Kilgore and Brite have sabotaged the plane. After the trio crash lands the plane in the ocean, Kilgore and Brite take them captive, then send divers to salvage the drugs from the plane. The Coast Guard arrives and arrests Kilgore and Brite. The trio flies clothes and gifts to a children's mission in South America.
 
 
 15
 "The A-Team" includes three members--Peck, Baracus, and Smith--who were wrongly faced with a court martial because, acting under orders from a colonel who died without verifying their story, they robbed the Bank of Hanoi of 100 million yen shortly after the end of the Vietnam war. A fourth man, Murdock, was the trio's pilot in Vietnam. Colonel Lynch, who ran the prison from which the group escaped more than 10 years before, still seeks to find them.
 
 
 16
 Peck is a suave con artist who is reluctant to participate in the A-Team's adventures. Baracas is a huge, mohawked, pugnacious, mechanical genius. Smith, the leader of the unit in Vietnam, continues to lead the group here. Murdock serves as the group's eccentric, possibly insane pilot. Lynch is a career military man. Amy Allen is an impetuous, dedicated newspaper reporter.
 
 
 17
 "The A-Team" is set in the present. In the pilot episode, Allen hires the A-Team to help her find a reporter who is missing in Mexico. The A-Team goes to Mexico and, with the reporter's assistance, accomplishes its mission. In the process, it rescues a terrorized town from a band of Mexican revolutionaries.[2]
 
 
 18
 At trial, Olson presented the testimony of an expert witness, William Talbot, who dissected the works and listed and analyzed similarities involving specific criteria such as characters, character relationships, plot incidents, scenes, theme, pace and mood. Talbot explained a chart and a 90-minute film montage which consisted of scenes from 27 episodes of "The A-Team." The district court found that Talbot's testimony and montage were entitled to little weight, given that he deemphasized any dissimilarities between plaintiff's and defendants' works and that his montage in effect compared unprotectable scenes a faire--that is, stock scenes. The district court's decision to discount this testimony was correct under Litchfield, 736 F.2d at 1356, which observes that such "lists of similarities" are "inherently subjective and unreliable," especially where they "emphasize[ ] random similarities scattered throughout the works."
 
 
 19
 "The A-Team" and Olson's works share a common idea: Both are group action-adventure series designed to show Vietnam veterans in a positive light. This idea, standing alone, is not protectable. See Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir.), cert. denied, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985) (finding no substantial similarity of ideas where two works dealt "with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and both works took "their general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization"); see Jason v. Fonda, 526 F.Supp. 774, 777 (C.D.Cal.1981), incorp'd by reference, 698 F.2d 966, 967 (9th Cir.1982) (observing that no copyright protection may be afforded to ideas "deal[ing] generally with subjects such as morality and the effects of war on women, injured veterans and soldiers").
 
 
 20
 Berkic sets forth the type of more specific analysis that is appropriate under the extrinsic test:
 
 
 21
 The test for "substantial similarity of ideas" compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters. The extrinsic test for similarity of ideas looks beyond the vague, abstracted idea of a general plot and instead "focuses on ... the objective details of the works.... The extrinsic test requires a comparison of plot, theme, dialogue, mood, setting, pace, and sequence."
 
 
 22
 Berkic, 761 F.2d at 1293 (quoting Litchfield, 736 F.2d at 1356); see Jason, 526 F.Supp. at 777.
 
 
 23
 We begin our analysis by applying these factors. We observe first that there is little similarity between "The A-Team" and the "Cargo" works in terms of overall plot, sequence, dialogue or setting. The "Cargo" crew is coerced by DEA agents into breaking up a drug-smuggling ring. The A-Team, in the pilot episode, is hired by a reporter to help her find a fellow reporter who is missing somewhere in Mexico. While some episodes of "The A-Team" may have included some of the plot incidents presented in "Cargo,"[3] such similarities were insufficient to constitute the type of congruence of plot relevant to the substantial similarity inquiry. See Berkic, 791 F.2d at 1293 (observing that no protection may be afforded to "situations and incidents which flow naturally from a basic plot premise"). Nor has Olson demonstrated the type of extended similarity of dialogue needed to support a claim of substantial similarity based upon this issue. The settings of the two works are too dissimilar to be relevant to the issue of substantial similarity.
 
 
 24
 Given this lack of similarity in plot, it is apparent that Olson's claim of substantial similarity is based primarily on the theory that "The A-Team" infringed "Cargo's" "series concept" and characters.[4] Olson argues that he may show substantial similarity of ideas without showing similarity as to each of the factors deemed relevant by Berkic and Litchfield. See Bevan v. Columbia Broadcasting System, Inc., 329 F.Supp. 601, 605 (S.D.N.Y.1971) (suggesting that copyright infringement may be found in the absence of similarity in the overall plots based upon similarities in "dramatic mood, the details and interplay of the characters, and the dynamic of events"). Without resolving this issue, we now determine whether those similarities that do exist demonstrate substantial similarity.
 
 
 25
 "The A-Team" and "Cargo" are similar in terms of theme, mood, and pace. The two shows emphasize action and lack identifiable themes. Both shows may be broadly described as comic, and they therefore have similar moods. Both works are quickly paced. However, these similarities are common to the genre of action-adventure television series and movies and therefore do not demonstrate substantial similarity. Cf. Berkic, 761 F.2d at 1293-94 (denying protection to "familiar scenes and themes [which] are among the very staples of modern American literature and film"); Walker v. Time Life Films, Inc., 784 F.2d 44, 50 (2d Cir.) (denying protection to " 'stock' themes commonly linked to a particular genre"), cert. denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986).
 
 
 26
 Olson's claim of substantial similarity is supported most strongly by a comparison between the characters in "Cargo" and those in "The A-Team." It is possible to find loose correspondences among the characters of the two works by comparing Van Druten to Peck, Brown to Baracus, Tronski to Murdock and Smith,[5] Marsha to Amy, and Kilgore to Lynch.
 
 
 27
 However, we find that Olson may not maintain a claim of substantial similarity based upon these similarities in characters. See Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc., 216 F.2d 945, 950 (9th Cir.1954) (stating that characters ordinarily may not be copyrighted), cert. denied, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955). Warner Bros. concerned a dispute arising out of Dashiell Hammett's assignment of the motion picture rights to his book, "The Maltese Falcon." Hammett subsequently wrote other stories using "Falcon" characters. The court concluded first that Hammett had not contracted away the rights to his characters. See id. at 949-50. In what is arguably dicta,[6] the court then stated that "if the character is only the chessman in the game of telling the story he is not within the area of the protection afforded by the copyright." Id. See Columbia Pictures Corp. v. National Broadcasting Co., 137 F.Supp. 348, 353 (S.D.Cal.1955) (stating that characters ordinarily are not protectable). Under Warner Bros., Olson's claim of substantial similarity based upon a comparison of characters appears doomed.
 
 
 28
 We recognize that cases subsequent to Warner Bros. have allowed copyright protection for characters who are especially distinctive. For example, cartoon characters may be afforded copyright protection notwithstanding Warner Bros. See Walt Disney Prods. v. Air Pirates, 581 F.2d 751, 755 (9th Cir.1978), cert. denied, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979). "[M]any literary characters may embody little more than an unprotected idea [while] a comic book character, which has physical as well as conceptual qualities, is more likely to contain some unique elements of expression." Id. See Warner Bros., Inc. v. American Broadcasting Cos., Inc., 720 F.2d 231, 240-45 (2d Cir.1983) (finding that copyright protection was available for the character of Superman although defendants' parody did not infringe copyright). For similar reasons, copyright protection may be afforded to characters visually depicted in a television series or in a movie. See Silverman v. CBS, Inc., 632 F.Supp. 1344, 1355 (S.D.N.Y.1986) (finding that the personifications of the characters from "Amos 'n' Andy" on television were distinctive enough to be afforded copyright protection); Ideal Toy Corp. v. Kenner Prods. Div. of General Mills Fun Group, Inc., 443 F.Supp. 291, 301 (S.D.N.Y.1977) (finding that the characters in the movie "Star Wars" were protected from infringement).
 
 
 29
 Even if the statements in Warner Bros. concerning the unprotectability of characters are considered to be dicta, the "Cargo" characters are not protectable even under the more lenient standards adopted elsewhere.[7] In the classic formulation of the doctrine, Judge Learned Hand stated that it was possible that two characters may correspond closely enough for infringement, "quite independently of the 'plot' proper, though, as far as we know, such a case has never arisen."
 
 
 30
 If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress.... [T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.
 
 
 31
 Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir.1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). See Warner Bros. Inc. v. Film Ventures Int'l, 403 F.Supp. 522, 525 (C.D.Cal.1975) (recognizing the need for distinctive delineation of a character).
 
 
 32
 Van Druten is neither Malvolio nor Mickey Mouse; Brown is neither Sir Toby Belch nor Superman. The "Cargo" characters are depicted only by three- or four-line summaries in the "Cargo" treatment and screenplay, plus whatever insight into their characters may be derived from their dialogue and action. Although such lightly sketched characters may be descriptive enough to sustain a finding of infringement where other Berkic factors are also copied, "Cargo" contained no descriptions which could be sufficient to afford copyright protection to a character taken alone. See Warner Bros., 216 F.2d at 950-51 (finding no infringement where the same characters with the same names were used). Olson's argument that substantial similarity should be found because of similarities between the ensemble of characters in "Cargo" and the characters in "The A-Team" also fails under Warner Bros. Warner Bros. found no possibility of infringement even though the author used the group of characters that he had employed in the "The Maltese Falcon." See id. at 948, 950.
 
 
 33
 We therefore uphold the district court's grant of j.n.o.v. to defendants on the ground that "The A-Team" and "Cargo" are not substantially similar under the extrinsic test.
 
 
 34
 Olson claims, in essence, that the defendants took his characters and his format for an action-adventure series. However, copyright law affords no protection to the format proposed by Olson. Nor may we find copyright infringement based upon a comparison of the characters in "Cargo" to those in "The A-Team," both because the "Cargo" characters were drawn so thinly and because the characters of "The A-Team" differed in significant ways from those in "Cargo."
 
 
 35
 There thus existed no substantial similarity under the extrinsic test. The intrinsic test likewise produces no basis for recovery. Although a reasonable jury might have found substantial similarity in "the total concept and feel of the works," Litchfield, 736 F.2d at 1357, and considerable deference is due to a jury's finding of substantial similarity under the intrinsic test, Krofft, 562 F.2d at 1166, "no substantial similarity may be found under the intrinsic test where analytic dissection demonstrates that all similarities in expression arise from the use of common ideas," Aliotti, 831 F.2d at 901 (citing McCulloch v. Albert E. Price, Inc., 823 F.2d 316, 320-21 (9th Cir.1987)). Because those similarities that do exist arose from unprotectable scenes a faire, there exists no substantial similarity of protectable expression under the intrinsic test.
 
 
 36
 II. The Cannell Defendants' Claim for Attorneys' Fees.
 
 
 37
 The Cannell defendants appeal the district court's denial of their request for attorneys' fees of $352,365, claiming that the court erred by failing to apply an "even-handed" approach to attorneys' fees in copyright cases. They do not argue that the district court erred in concluding that they were not entitled to attorneys' fees under a standard requiring a showing of bad faith or frivolity.
 
 
 38
 The Cannell defendants claim that Olson has waived his claim that the district court erroneously granted them an extension of time to file their notice of appeal because he failed to include this claim in his opening brief. However, claims of defects in subject matter jurisdiction may be raised at any time, either by the parties or sua sponte by the court. See Bender v. Williamsport Area School Dist., 475 U.S. 534, 541-42, 106 S.Ct. 1326, 1331-32, 89 L.Ed.2d 501 (1986) (observing that appeals courts have a special obligation to satisfy themselves that they have jurisdiction); United States v. Stolarz, 547 F.2d 108, 109-10 (9th Cir.1976) (finding that an appeal was untimely after the court first raised the question of jurisdiction at oral argument), cert. denied, 434 U.S. 851, 98 S.Ct. 162, 54 L.Ed.2d 119 (1977); cf. Fed.R.Civ.P. 12(h)(3) (providing that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action").
 
 
 39
 We find that the Cannell defendants timely sought and obtained an extension under Fed.R.App.P. 4(a)(5). Although the district court filed its nunc pro tunc j.n.o.v. on December 8, 1986, the judgment was not entered until December 15, 1986. Under Fed.R.App.P. 4(a)(1), a party must appeal within 30 days of the time that the judgment is entered. Under Fed.R.App.P. 4(a)(5), the district court "upon a showing of excusable neglect or good cause" may within 30 days after expiration of the time for filing extend the time for filing a notice of appeal, subject to certain time limitations. The district court, in an order stating that good cause had been shown, on February 11, 1987 extended the period in which notice of appeal could be filed until February 13, 1987. Because February 11, 1987 was within 60 days of December 15, 1986, the district court had power to grant an extension; the two extra days did not exceed the permissible period of extension. We therefore find that the notice of appeal was timely filed and that we have jurisdiction to consider the appeal.
 
 
 40
 The Cannell defendants urge us to adopt an even-handed approach for awarding attorneys' fees under 17 U.S.C. Sec. 505 (1982), citing cases from other jurisdictions. See Lieb v. Topstone Indus., Inc., 788 F.2d 151, 154-56 (3d Cir.1986); Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 832 (11th Cir.1982); Cohen v. Virginia Elec. & Power Co., 617 F.Supp. 619, 620-23 (E.D.Va.1985), aff'd, 788 F.2d 247 (4th Cir.1986); Williams Elecs. v. Bally, 1983 Copyright L.Dec. (CCH) p 25,582 at 18,436 (N.D.Ill.1983) However, our circuit has expressly held that an award of attorneys' fees to a prevailing defendant in an action brought under 17 U.S.C. Sec. 505 (1982) is appropriate only where there has been "a finding of bad faith or frivolity." Cooling Systems and Flexibles, Inc. v. Stuart Radiator, Inc., 777 F.2d 485, 493-94 (9th Cir.1985) (declining to break with Ninth Circuit precedent to follow cases from other circuits that adopt a more lenient standard); Jartech, Inc. v. Clancy, 666 F.2d 403, 407 (9th Cir.), cert. denied, 459 U.S. 879, 103 S.Ct. 58, 74 L.Ed.2d 62 (1982) (awarding attorneys' fees only for "a frivolous or bad faith suit"). Any decision to overrule these cases and to adopt an even-handed approach must be made by an en banc court. We therefore affirm the district court's decision to deny attorneys' fees to the Cannell defendants.
 
 
 41
 III. Conclusion.
 
 
 42
 We affirm the district court's grant of j.n.o.v. to defendants on the ground that there existed no substantial similarity of ideas or protectable expression. Our ruling makes it unnecessary for us to determine whether Olson could seek to have the Cannell defendants held liable as innocent infringers, whether the district court properly granted a new trial in the alternative, or whether certain evidence and testimony should be admitted at any new trial. We also affirm the district court's order refusing the Cannell defendants' request for attorneys' fees.
 
 
 43
 AFFIRMED.
 
 
 
 *
 The Honorable Robert H. Schnacke, United States District Judge, Northern District of California, sitting by designation
 
 
 [1]
 We will refer to Cannell, MCA Inc. and MCA Television Ltd. collectively as "the Cannell defendants."
 
 
 [2]
 None of the other episodes of "The A-Team" shown to the jury had plots that were similar in pattern to the plot of "Cargo."
 
 
 [3]
 Olson's expert witness pointed to a multitude of such similarities of plot incidents, ranging from the potentially relevant to the insignificant. While we might conceivably be able to find substantial similarity based upon the concatenation of scenes a faire as distinctive as the occurrence in both works of a cigar-smoking man firing a machine gun from the back of a truck, we could never make such a finding based upon comparisons as tenuous as those concerning the tennis shoes worn by characters in the two works. See Litchfield, 736 F.2d at 1356 (observing the unreliability of lists that rely upon scattered random similarities)
 
 
 [4]
 NBC argues that copyright protection cannot be afforded to a series concept, citing 17 U.S.C. Sec. 102(b) (1982), which states that copyright protection may not be afforded to "any idea, procedure, process, system, method of operation, concept, principle, or discovery." Although NBC is correct insofar as the term "concept" is used as a synonym for "idea," Olson points out that the term "series concept" refers to "the critical mass of a series and includes virtually everything that drives a television series." Thus, Sec. 102(b) is not by its terms dispositive of Olson's claim
 
 
 [5]
 Olson argues that he may properly compare his character Tronski with the "A-Team" characters of Smith and Murdock. See Universal City Studios, Inc. v. Film Ventures Int'l, Inc., 543 F.Supp. 1134, 1137-38 (C.D.Cal.1982) (finding that the local shark expert in the film "Great White" constituted a combination of the shark expert and the local police chief in "Jaws"). NBC attempts to distinguish Universal City Studios on the ground that the infringing work combined plot functions of two characters, instead of splitting up a single character. See Rose v. Connelly, 38 F.Supp. 54, 55-56 (S.D.N.Y.1941) (rejecting the plaintiff's attempt to demonstrate that two characters who were not alike were similar by splitting the characteristics of plaintiff's character among more than one of defendant's characters). To the extent that Smith and Murdock share plot functions that Tronski possesses by himself, comparison is proper under Universal City Studios. To the extent that Smith and Murdock are similar in character to Tronski, Rose does not preclude comparison; Rose rejected an attempt to mix and match character traits in order to prove similarity, not a claim that one character's traits were split between two infringing characters
 
 
 [6]
 In Walt Disney Prods. v. Air Pirates, 581 F.2d 751, 755 n. 10 (9th Cir.1978), cert. denied, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979), we recognized that it is unclear whether this language is dicta or an alternate holding, but we declined to resolve the issue because Warner Bros. could be distinguished on other grounds. See Columbia Broadcasting System, Inc. v. DeCosta, 377 F.2d 315, 319-20 (1st Cir.) (finding that Warner Bros. was "far from saying that characters are inherently uncopyrightable" because it held only that the contract of assignment did not convey the exclusive right to use the characters and that the sequel was not so similar as to infringe the copyright), cert. denied, 389 U.S. 1007, 88 S.Ct. 565, 19 L.Ed.2d 603 (1967)
 
 
 [7]
 We therefore need not resolve the issue left open in Air Pirates, 581 F.2d at 755 n. 10, whether the Warner Bros. statements should be considered dicta